**Dorothy Dutton, June Messier & Lester Brown**

v.

**Department of Social Welfare**

[721 A.2d 109]

No. 97-222

Present: Amestoy, C.J., Morse, Johnson and Skoglund, JJ., and Wesley, Supr. J., Specially Assigned.

Opinion Filed September 11, 1998

*William Dysart*, Vermont Legal Aid, Inc., Burlington, for Plaintiffs-Appellants.

*Donelle Smith Staley*, Assistant Attorney General, and *Christopher L. White*, Law Clerk (On the Brief), Waterbury, for Defendant-Appellee.

**Johnson, J.** Petitioners appeal from Human Services Board fair hearing decisions denying their applications for fuel assistance. Petitioners argue (1) that the definition of household in the Vermont Home Heating Fuel Assistance regulations is inconsistent with the definition found in the federal Low-Income Home Energy Assistance Act, 42 U.S.C. §§ 8621-8629, and (2) that this inconsistency results in the denial or reduction of fuel assistance to certain households in

violation of the federal act. We agree and reverse the orders of the Human Services Board.

Petitioners are two elderly homeowners and a boarder, each of whom resides in a house in which a boarder rents a separate room. In each case, the boarder either prepares his meals or eats with the rest of the household in a common kitchen and dining area. The boarders do not make separate payments for heating fuel; rather, heat is furnished by the landlord and its cost is included in the rent. Petitioners separately applied to the Department of Social Welfare (DSW) for supplemental fuel assistance, and their applications were denied. Petitioner Dutton's application was denied because she did not provide information regarding the income and assets of her son who rents a room in her house. Petitioner Messier was refused fuel assistance because he failed to provide information about the income and resources of the individual to whom he rents a room. Petitioner Brown was refused fuel assistance because he failed to provide information about the income and resources of the owners of the house in which he rents a room. Petitioners appealed the denial of their applications to the Human Services Board, arguing that the state regulation defining a fuel "household" is inconsistent with the definition in the federal act. The appeals were consolidated by agreement of the parties, and the Board affirmed DSW's denial of fuel assistance.

The Low-Income Home Energy Assistance Act establishes a federal program providing block grants to states to help low-income households defray the cost of their home energy. Participating states are authorized to design their own plans to administer and distribute the block-grant funds, and the federal act expressly delegates to states the authority to define "the eligibility requirements to be used by the State for each type of assistance to be provided." *Id.* § 8624(c)(1)(A). Under the Department of Health and Human Services regulations, "the States are primarily responsible for interpreting the governing statutory provisions." 45 C.F.R. § 96.50(e) (1997). Thus, under the federal act, states may craft their own fuel-assistance plans "[s]o long as minimal requirements established under the Act are met." *Rodriguez v. Cuomo*, 953 F.2d 33, 34 (2d Cir. 1992).

The federal act defines a fuel household as "any individual or group of individuals who are living together as one economic unit for whom residential energy is customarily purchased in common or who make undesignated payments for energy in the form of rent." 42 U.S.C. § 8622(4). The concept of a fuel "household" plays a crucial role in the federal statutory scheme because it determines whose income and

assets are considered when determining if the household meets the threshold requirements to be eligible for assistance. See *id.* § 8624(b)(2). Other minimum requirements are similarly linked to the concept of a fuel household. Participating states must agree to "provide . . . that the highest level of assistance will be furnished to those households which have the lowest incomes and the highest energy costs or needs in relation to income." *Id.* § 8624(b)(5). States may not condition assistance on whether the household owns or rents the residence; rather, they must agree to "treat owners and renters equitably." *Id.* § 8624(b)(8).

Vermont's fuel-assistance program, governed by 33 V.S.A. §§ 2601-2609, creates a trust fund from which fuel-assistance payments are distributed. See 33 V.S.A. § 2603(a). The Secretary of the Agency of Human Services is directed by statute to establish household income and asset eligibility requirements for participation in the program, see *id.* § 2604(a), and to adopt regulations governing the calculation of a household's fuel costs, see *id.* § 2604(b).

The Vermont program's regulations define a fuel household as "one or more persons residing in a living unit who share a primary heating source, regardless of . . . the cost-sharing arrangement for living and heating expenses among those people, or whether secondary heating sources are shared, or the relationship of each person to other persons in the living unit." Welfare Assistance Manual (WAM) § 2901.1(4), 5 Code of Vermont Rules 13170006-3 (1997). The regulations also require consideration of the income and assets of "all Fuel Program household members sharing a primary heating source." *Id.* § 2904, 5 Code of Vermont Rules 13170006-6. A primary heating source is "the fuel from which a household derives the largest portion of its heat. . . . [and] is considered to be shared unless the primary fuel supplier can identify for billing purposes discrete user groups within the living unit." *Id.* § 2901.1(3), 5 Code of Vermont Rules 13170006-3. Thus, in contrast to the federal act, which focuses on the economic relationship between individuals or separate families, DSW's definition of an eligible household focuses on the heating source and to whom the fuel supplier sends a bill.

The Human Services Board determined, pursuant to these regulations, that the homeowners and boarders in each of the three cases at bar were part of the same fuel household because they resided in the same living unit and shared a primary heating source. Accordingly, the Board concluded petitioners were required to include the income and assets of both the homeowners and the boarder in their

applications for fuel assistance. The Board also concluded that because petitioners failed to include this information, their applications were properly denied.

DSW contends that our review of the Board's interpretation of the federal act is limited. It argues that we have reviewed state administrative agency interpretations of federal statutes under the same standard employed by federal courts when reviewing federal agencies' interpretations of statutes. See, e.g., *Shedrick v. Department of Social Welfare*, 158 Vt. 541, 545-46, 613 A.2d 692, 694 (1992) (reviewing DSW interpretation of food stamp act under federal standard); *St. Amour v. Department of Social Welfare*, 158 Vt. 77, 81, 605 A.2d 1340, 1342 (same). It is true that where a statute is silent as to a specific issue, we will defer to an agency's interpretation provided that it "is based on a permissible construction of the statute." *St. Amour*, 158 Vt. at 81, 605 A.2d at 1342 (quoting *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 843 (1984) (internal quotation marks omitted)). DSW urges that deference is even more appropriate in this case because the federal government has granted the state broad powers to administer its fuel assistance programs, and the Vermont Legislature has, in turn, delegated this authority to DSW. In light of this express delegation, DSW asserts that we should not disturb the Board's interpretation of the federal act "absent a compelling indication of error," citing *In re Professional Nurses Service, Inc.*, 164 Vt. 529, 532, 671 A.2d 1289, 1293 (1996) (stating standard of review for decisions within an agency's particular area of expertise). We disagree.

We recognize that "[s]tates are primarily responsible for interpreting the governing statutory provisions" of block grant programs. 45 C.F.R. § 96.50(e). Nonetheless, interpreting the definition of "household" utilized by Congress is not a matter of interstitial rulemaking by an agency to implement its interpretation of the statute. Instead, Congress expressly provided a federal definition that delineates the minimum requirements governing the states' use of the federal grants. Therefore, determining whether the federal and state definitions are consistent "is a matter that requires statutory interpretation — the exclusive province of the courts." *Rodriguez*, 953 F.2d at 39 (holding that interpreting a minimal requirement under the federal Low-Income Home Energy Assistance Act is a matter for courts).

## I.

Petitioners first argue that, to the extent the definition of a fuel household in the Vermont program's regulations categorically in-

cludes boarders in the same fuel household as the homeowners, it is inconsistent with the definition in the federal act. DSW contends that the Vermont program's definition of household is consistent with the federal definition.* DSW argues that the phrase "any individual or group of individuals who are living together as one economic unit for whom residential energy is customarily purchased in common" in the federal act in fact means "all persons who share a common heating source."

In support of its argument, DSW points out that prior to amendment, the federal act defined household as "all individuals who occupy a housing unit." Pub. L. No. 97-35 § 2603(2)(A), 95 Stat. 893, 894 (1981). The unamended version of the statute also mandated that "1 or more rooms shall be treated as a housing unit when occupied as a separate living quarters." *Id.* § 2603(2)(B). DSW claims that this definition permitted several persons living in the same house to receive fuel-assistance benefits individually even though the homeowner or the person holding the lease was the sole person responsible for paying the heating bill for the entire unit. This result, DSW argues, was inconsistent with the federal objective of providing the greatest benefits to those most in need in that it did not reflect the "economic reality that the income of all persons sharing a common heating source may be made available to contribute toward payment of a common household's utility bills." DSW contends that Congress redefined household to remedy the situation, intending the new definition to include all persons who share a common heating source. We cannot agree with this interpretation.

DSW's interpretation of the statute would render the term "economic unit" meaningless and is therefore "contrary to the 'presumption against construing a statute as containing superfluous or meaningless words.'" *Marbley v. Bane*, 57 F.3d 224, 230 (2d Cir. 1995) (quoting *United States v. Blasius*, 397 F.2d 203, 207 n.9 (2d Cir. 1968)); see also *United States v. Plaza Health Lab.*, 3 F.3d 643, 646 (2d Cir. 1993) ("It is elemental that congress does not add unnecessary words to statutes."); *Butts v. City of New York Dep't of Hous. Preservation & Dev.*, 990 F.2d 1397, 1408 (2d Cir. 1993) ("[I]t is the duty of reviewing

---

*DSW also notes that the state regulations are consistent with the state statute creating Vermont's fuel program. Assuming, arguendo, that DSW is correct, we fail to see how it is significant. Petitioners do not argue that the state regulations are inconsistent with the state statute, but that they violate the federal statute. If the state regulations are in conflict with federal law, the fact that they are consistent with state law would not remedy this problem.

courts to give effect to every clause and word of a statute where possible."). The language of the statute indicates that Congress intended to distinguish between people "living together as one economic unit" and sharing heating facilities, and people merely residing at the same address and sharing heating facilities. See *Shedrick*, 158 Vt. at 546, 613 A.2d at 694 ("We will not construe [a] statute to render a clear distinction meaningless.").

More importantly, we reject DSW's assertion that it is an "economic reality" that the income of all persons sharing a common heating source is available to contribute to the cost of the heating fuel. Indeed, the gravamen of petitioners' complaint is that they do not have access to the income and assets of the other persons sharing their heating source. DSW urges the Court to effectively adopt this assumption of "economic reality" as an irrebuttable presumption. This we decline to do.

We therefore agree with the petitioners that the plain meaning of the phrase "living together as one economic unit" implies that the individuals must depend on one another for financial support. Although Congress did not define the term "economic unit" in the statute, this is not the first time that Congress has employed the term in the social welfare context. Before 1977, a household for purposes of the food stamp program was defined as a group of people who are "'living as one economic unit sharing common cooking facilities and for whom food is customarily purchased in common.'" *Knowles v. Butz*, 358 F. Supp. 228, 231 (N.D. Cal. 1973) (quoting 7 U.S.C. § 2012(e)). In *Knowles*, a federal district court, relying on the definition of "economic unit" provided in the accompanying regulations, rejected the contention that all persons who shared a living unit and the associated expenses met the statutory definition of "household." The regulations stated that *"[e]conomic unit* means that the common living expenses are shared from the income and resources of all members and that the basic needs of all members are provided for without regard to their ability or willingness to contribute." Food and Nutrition Service Instruction 732-1, § III(D)(2)(b), *quoted in Knowles*, 358 F. Supp. at 231. We agree that this definition is "a full and fair attempt to interpret in a commonsense manner what Congress probably meant by the term." *Knowles*, 358 F. Supp. at 231; see also *Robinson v. Block*, 869 F.2d 202, 211 (3d Cir. 1989) (term "economic unit" takes into account the "'common living expenses' of all members of a group of people"). We therefore conclude that this definition of economic unit is implicit in the federal definition of "household."

■ We note that the available legislative history supports this construction to the exclusion of DSW's interpretation. The Senate sponsor of the amendment explained that the definition of household needed to be changed because "[t]he definition that is now in the Low Income Home Energy Act does not adequately address the needs of low-income owners who have lodgers living in their homes. There was no intent of Congress to exclude these persons and this amendment would cover them by [re]defining household . . . ." 127 Cong. Rec. 26,234 (1981). Thus, the amendment appears to address precisely the difficulties faced by petitioners. The adoption of the revised definition of "household" indicates that Congress did not intend low-income homeowners to be excluded from the fuel program merely because they had lodgers living in their homes. Although we do not regard the sponsor's statement as conclusive of congressional intent, it buttresses our conclusion that homeowners and the lodgers living in their homes are not per se members of the same fuel household.

## II.

■ We also agree with petitioners' claim that the Vermont program's definition of "household" results in a violation of the federal requirement that the state plan "provide . . . that the highest level of assistance will be furnished to those households which have the lowest incomes and the highest energy costs or needs in relation to income." 42 U.S.C. § 8624(b)(5). For purposes of determining a household's eligibility for fuel assistance, the Vermont program's regulations result in the automatic inclusion of the income and assets of all those living at the same residence and sharing a primary heating unit regardless of the relationship between them or their cost-sharing arrangements. See WAM § 2901.1(4), 5 Code of Vermont Rules 13170006-3. The cases at bar are illustrative. The Vermont program's regulations include the boarder in the same household as the others living within the dwelling unit even though, except for the rental payments, the income and assets of the boarder may not be available to meet the fuel costs of the remaining household members. Because the state has improperly defined "economic unit," it cannot determine which households have the "lowest incomes and the highest energy costs in relation to income." Without this information, it cannot demonstrate compliance with this federal requirement. In the absence of sufficient information to determine which households are neediest, a program violates the federal Low-Income Home Energy Assistance Act. See *Mitchell v. Hayt*, No. 88-CV-382, slip op. at 20-21

(N.D.N.Y. Dec. 16, 1988) (fuel-assistance program definition of household that automatically included the income of all persons occupying dwelling unit violated 42 U.S.C. § 8624(b)(5)). The state's plan must seek to achieve this goal not for households as defined by the state, but for households as defined by Congress. Cf. *Brisson v. Department of Social Welfare*, 167 Vt. 148, 151, 702 A.2d 405, 407 (1997) (state Medicaid regulations must achieve federal, not state, purpose).

*Reversed and remanded for further proceedings in accordance with this opinion.*